Filed 11/22/13  In re Etheridge CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re DANIEL ETHERIDGE<br><br>on Habeas Corpus. | B244852<br><br>(Los Angeles County<br>Super. Ct. No. LA025300) |

ORIGINAL PROCEEDING; petition for a writ of habeas corpus.  Martin L. Herscovitz and Bert Glennon, Jr., Judges.  Petition granted.

Daniel Etheridge, in pro. per.; and Marilee Marshall, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James W. Bilderback III, Supervising Deputy Attorney General, Chung L. Mar and Peggy Z. Huang, Deputy Attorneys General, for Respondent.

————————————————————

Daniel Etheridge petitions for a writ of habeas corpus, contending the jury was improperly instructed on robbery and the evidence is insufficient to support his robbery conviction. We grant the petition, modify Etheridge's robbery conviction to be petty theft with a prior, and remand for resentencing.

**BACKGROUND**

In bifurcated proceedings in 1997, a jury convicted Etheridge of second degree robbery, acquitted him of petty theft, and found that he had suffered two prior residential burglary convictions that were alleged pursuant to the "Three Strikes" law and Penal Code section 667, subdivision (a)(1). The trial court sentenced Etheridge to a third strike term of 35 years to life.

Etheridge appealed, and this court affirmed the judgment in case No. B112249 (May 28, 1998 [nonpub. opn.]). Our opinion summarized the evidence at trial: "At approximately 7:30 p.m. on September 22, 1996, Tony Martinez (Martinez), a security officer for Lucky's market, saw defendant pick up a bottle of beer, then walk to the meat department. Defendant picked up a packaged steak that was 'a couple' of inches thick, walked into the warehouse area at the rear of the store, placed the package of meat in a Sav-on bag and slipped the bag underneath the loading dock door. According to Martinez, the loading dock door rolls upward on chains; it normally sits two or three inches above the ground. The door is easy to lift slightly even if it is locked.

"Martinez lost sight of defendant for a brief time. He next saw him near the check stands, carrying a Lucky's bag that contained the bottle of beer defendant had selected. Martinez and his fellow security officer, Jared Hollingsworth (Hollingsworth), followed defendant outside. Defendant walked to the rear of the store; he stopped at the loading dock door and picked up the package of meat he had slipped beneath the door earlier.

"Martinez and Hollingsworth identified themselves as store security. Defendant ran; Martinez and Hollingsworth pursued him. As he ran, defendant threw the bag containing the steak onto the roof of a nearby building. Martinez overtook defendant; when he grabbed one of defendant's arms, defendant pulled his arm loose, then struck

2

Martinez on the collar bone with a palm-sized rock. Martinez's arm went limp. He had a large bruise on his left collar bone and was in considerable pain.

"Defendant ran across the street; Hollingsworth apprehended him. Defendant was holding one rock in his hand; he had another rock in his fanny pack. Approximately 30 minutes later, Hollingsworth found the package of meat, in the Sav-on bag, on the roof of the Sav-on store.

"Martinez failed to record in his store report that defendant had slipped the package of meat under the loading dock door or that he had thrown it on the roof of a building. The report did record that defendant concealed the package in a bag and threw it away during the chase."

Our opinion in case No. B112249 summarized the defense evidence: "At 7:33 p.m. someone purchased an item, which could have been some sort of liquor, for $1.13 at the 'quick cash register.' This is the price of the bottle of beer found in defendant's possession. [¶] A defense investigator determined that the loading dock door would not rise higher than seven-eighths of an inch above the ground when it was locked. A package of two-inch thick meat therefore would not fit beneath it. [¶] Defendant had no cooking facilities in his apartment. He did not have a pet that would eat meat."

We further note that no one testified that Etheridge failed to pay for the beer. Martinez testified that the beer was not in any sort of bag when Etheridge carried it into the warehouse area. Martinez lost sight of Etheridge after he left the warehouse area. He next saw Etheridge at the front of the store in the check stand area. Martinez did not see whether Etheridge went through a check stand with the beer, but he did see that the beer was in a Lucky's bag. Martinez further testified that Etheridge said he had purchased the beer. The store manager testified that he inquired of the employee on duty at the quick cashier check stand and learned that someone had purchased at his check stand a bottle of the same brand of beer Etheridge possessed. The cashier also testified that he got a quick look at someone the security personnel brought into the store, but he was unsure whether the person had checked out through his line or not. The cashier testified that Etheridge might have gone through his line, but he could not be certain.

3

Although the prosecutor made several references in his closing argument to the jury to Etheridge "possibly" not paying for the beer, he expressly premised both the robbery and petty theft counts on the taking of the steak. The defense argued that Etheridge bought the beer and the store personnel fabricated their tale of him placing the steak through the loading dock door. In his rebuttal argument the prosecutor denied that the prosecution was conceding that defendant bought the beer, argued there was "a lot of evidence" indicating that the defendant stole the beer, but conceded that the evidence regarding someone purchasing a beer of that brand at that time at the express check stand "certainly could raise a reasonable doubt" about theft of the beer. The prosecutor repeatedly argued that the undisputed evidence showed that "defendant took that steak and in taking that steak the defendant used force."

On his appeal, Etheridge did not challenge the sufficiency of the evidence or the accuracy of the jury instructions.

On October 31, 2012, Etheridge filed the instant petition for a writ of habeas corpus, which contends, in essence, that the evidence was insufficient to support his robbery conviction and the jury was improperly instructed regarding the law pertaining to robbery. After receiving and considering informal opposition to the petition from the Attorney General, we issued an order to show cause and appointed counsel to represent Etheridge. The Attorney General filed her Return, and Etheridge filed his Traverse.

## DISCUSSION

"The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." (*In re Dixon* (1953) 41 Cal.2d 756, 759.) But "that general rule is primarily a discretionary policy which may be overlooked where "special circumstances" are deemed to exist." (*In re Coughlin* (1976)16 Cal.3d 52, 55.) "[A]lthough a remedy by appeal or other direct attack might have been available, the writ of habeas corpus nevertheless will lie where special circumstances are presented." (*In re Antazo* (1970) 3 Cal.3d 100, 107.) "This court has

4

held that the presence of a constitutional question of extraordinary importance constitutes special circumstances sufficient to relieve a petitioner from the operation of the above-mentioned general rule." (*Id.* at pp. 107–108.) Such special circumstances exist here.

The trial court used CALJIC No. 9.40 to instruct the jury on the elements of robbery. The court then added its own special instruction: "The crime of robbery is a continuous offense that begins from the time of the original taking until the robber reaches a relative place of safety. The element of force or fear is satisfied if the defendant used force or fear to prevent the recovery of stolen property *or to facilitate escape*." (Italics added.) Etheridge objected to this instruction in the trial court as unnecessary, but not as an incorrect statement of the law. The trial court overruled his objection.

Etheridge argues that the court's special instruction incorrectly states the law, in that force or fear must be used to prevent the recovery of stolen property *and* facilitate escape. The Attorney General contends the instruction correctly states the law and argues that Etheridge used force to attempt to escape with the beer.

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.) This includes a duty to instruct on all of the elements of the charged offense. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.) An instructional error that improperly describes or omits an element of an offense constitutes federal constitutional error that is subject to review under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824]: the error is harmless if it appears beyond a reasonable doubt that it did not contribute to the jury's verdict. (*People v. Flood* (1998) 18 Cal.4th 470, 503–504.)

Robbery is defined as the taking of personal property of some value, however slight, from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property. (Pen. Code, § 211; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) "A defendant who does not use force or fear in the initial taking of the property may nonetheless be guilty of robbery if he uses force or fear

5

to retain it or carry it away in the victim's presence." (*People v. McKinnon* (2011) 52 Cal.4th 610, 686.)

In *People v. Estes* (1983) 147 Cal.App.3d 23 (*Estes*), the defendant put on clothing that was for sale in a Sears store and walked out of the store without paying for the items. A Sears security guard followed Estes outside the store and confronted him about the merchandise. Estes began walking away, and when the guard attempted to detain him, Estes drew a knife, swung it at the guard, and threatened to kill him. Estes was subsequently detained without incident when the security guard returned with a second guard. (*Id.* at p. 26.) Estes was convicted of robbery and theft. On appeal he argued that he had not taken the merchandise from the immediate presence of the security guard and had not used force or fear to take the property because "his assaultive behavior was not contemporaneous with the taking of the merchandise from the store." (*Id.* at p. 28.)

With respect to the guard's immediate presence, the appellate court stated, "The evidence establishes that appellant forceably resisted the security guard's efforts to retake the property and used that force to remove the items from the guard's immediate presence." (*Estes*, *supra*, 147 Cal.App.3d at p. 27.) "[A] robbery occurs when defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which defendant originally acquired the property." (*Id.* at pp. 27–28.) With respect to the timing of Estes's use of force, the court stated, "The crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety. It is sufficient to support the conviction that appellant used force to prevent the guard from retaking the property and to facilitate his escape. The crime is not divisible into a series of separate acts. Defendant's guilt is not to be weighed at each step of the robbery as it unfolds. The events constituting the crime of robbery, although they may extend over large distances and take some time to complete, are linked by a single-mindedness of purpose. [Citation.] Whether defendant used force to gain original possession of the property or to resist attempts to retake the stolen property, force was

applied against the guard in furtherance of the robbery and can properly be used to sustain the conviction." (*Id.* at p. 28.)

The California Supreme Court cited *Estes* and earlier cases with approval in *People v. Cooper* (1991) 53 Cal.3d 1158, 1165, footnote 8 (*Cooper*), where the court succinctly summarized the law: "In order to support a robbery conviction, the taking, either the gaining possession or the carrying away, must be accomplished by force or fear."

In *People v. Gomez* (2008) 43 Cal.4th 249, 260 (*Gomez*), the California Supreme Court again cited *Estes* with approval. The issue in *Gomez* was whether the immediate presence element could also be satisfied during the asportation phase. The manager of a business arrived after Gomez seized property from the business, but before Gomez departed with it. The manager followed Gomez, who fired a gun toward the manager's vehicle, causing the manager to abandon pursuit. After discussing *Estes*, the Supreme Court concluded, "By the same logic, the immediate presence element can be satisfied at any point during the taking." (*Gomez*, *supra*, 43 Cal.4th at p. 261.) The court explained, "It is the conduct of the perpetrator who resorts to violence to further his theft, and not the decision of the victim to confront the perpetrator, that should be analyzed in considering whether a robbery has occurred. As we observed in *People v. Ramos* (1982) 30 Cal.3d 553, 589, 'the central element of the crime of robbery [is] the force or fear applied to the individual victim in order to deprive him of his property.' That deprivation of property occurs whether a perpetrator relies on force or fear to gain possession or to maintain possession against a victim who encounters him for the first time as he carries away the loot." (*Gomez*, *supra*, 43 Cal.4th at pp. 264–265.)

In *People v. Hodges* (2013) 213 Cal.App.4th 531 (*Hodges*), a man walked out of a grocery store with bottles of soft drink and bananas without paying for them. Security officers for the store followed the man and confronted him after he was seated in his car. When the officers asked him to accompany them back into the store, he offered to give the groceries back. They refused to accept them, and Hodges started his car engine. One officer told Hodges he had to return to the store. Hodges got out of the car and shoved or

7

"tossed" the groceries at the security officer. Some of the goods struck the officer in the chest or face. The officer fell back against another vehicle. The same officer reached inside the car and attempted to removed the keys, but Hodges began driving away, dragging the officer. (*Id.* at pp. 535–536.) Hodges was charged with robbery, assault with a deadly weapon, and petty theft with a prior. During deliberations, the jury asked the court about the application of the robbery instruction, CALCRIM No. 1600. The jury's note stated, "'[T]he force/fear was subsequent to the act, in the parking lot, after the defendant had surrendered the goods . . . . [¶] Does the timing/sequence of events— theft, then force/fear bear on the applicability of this clause—would point 4 [use of force or fear to take the property or prevent the person from resisting] apply here?'" The court responded by telling the jury, "'[T]he theft is deemed to be continuing until the defendant has reached a point in which he is no longer being confronted by the security guards. Thus, item 4 of the instruction 1600 applies to the confrontation in the parking lot.'" (*Id.* at p. 538.)

The appellate court in *Hodges*, *supra*, 213 Cal.App.4th 531, reversed Hodges's robbery conviction because it concluded that the trial court's response to the jury's question "failed to address the crux of the jury's inquiry," "was misleading because it allowed the jury to conclude defendant was guilty of robbery without regard to whether defendant intended to permanently deprive the owner of the property at the time the force or resistance occurred," and "improperly resolved the factual conflict inherent in the jury's inquiry regarding the impact of defendant's surrender of the goods prior to the use of force." (*Id.* at p. 543.) With respect to the final point, the court noted, "Under the case law discussed *ante,* because defendant did not use force in taking the property, in order to convict him of robbery the prosecution had to prove, and the jury had to find, defendant used force to *maintain possession* of the property against the lawful efforts of the owner to regain it." (*Id.* at p. 543, fn. 5, italics added.) The court further noted that where a person leaves a store without paying for goods, drops the goods when confronted by a security guard, flees, and "uses force to resist the pursuing guard's attempt to detain him," "the escape rule, concerning the *duration* of the offense, is not in play because no

8

robbery was *committed*, there being no evidence that the person intended to deprive the owner of the property at the time force was used." (*Id.* at p. 543, fn. 4.)

Here, Etheridge did not use force or fear to take possession of the steak or to resist attempts by the grocery store security personnel to retake the stolen steak. He abandoned the steak by throwing it on the roof before the guards caught up to him. He used force only *after* he abandoned the steak. Thus, he did not "rel[y] on force or fear to gain possession or to maintain possession." (*Gomez*, *supra*, 43 Cal.4th at p. 265.) His crimes were assault and theft, but not robbery, yet the trial court's special instruction permitted the jury to convict Etheridge of robbery based upon his use of force to facilitate his escape attempt after he abandoned the steak. As in *Hodges*, the court's instruction was erroneous because "it allowed the jury to conclude defendant was guilty of robbery without regard to whether defendant intended to permanently deprive the owner of the property *at the time the force or resistance occurred*." (*Hodges*, *supra*, 213 Cal.App.4th at p. 543, italics added.) We reject the Attorney General's claim that Etheridge's robbery conviction can rest upon the taking of the beer, given the prosecutor's concession at trial the evidence created a reasonable doubt regarding theft of the beer and the prosecutor's election that the taking of the steak, and not the beer, was the crux of the robbery.

The Attorney General relies upon *People v. Carroll* (1970) 1 Cal.3d 581 (*Carroll*), in which Carroll pointed a gun at the victim, Gulsvig, in the rest room, causing Gulsvig to hand over his wallet. Carroll discovered that there was no money in the wallet and threw it on the wash basin. Gulsvig ran back into the bar, pursued by Carroll, who threatened to kill Gulsvig and fired two shots at him. Gulsvig ran behind the bar and hid. Carroll went behind the bar, shot Gulsvig, removed money from the bar's cash register, and left. Carroll was convicted of robbery and a great bodily injury enhancement was found true. (*Id.* at p. 583.) On appeal, Carroll challenged the applicability of the enhancement, arguing that the robbery of Gulsvig was completed when Carroll threw the wallet away, and "any offense thereafter committed was separate and distinct and did not occur in the commission of his robbery of Gulsvig." (*Id.* at p. 584.) The California Supreme Court rejected this contention, stating, "The fact that defendant was not engaged in the

9

asportation of any loot at the time he shot Gulsvig is immaterial. He became angry after discovering no money in the wallet and having the rest room door slammed in his face. His purpose in running into the bar appears to have been to exact his revenge from Gulsvig. Under the circumstances, the robbery and shooting of Gulsvig constituted one indivisible transaction, with the shooting flowing directly from the taking of the wallet. [¶] In addition, it is settled that the crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place. Thus, the crime of robbery is not complete until the robber has won his way to a place of temporary safety. [Citations.] In the present case, defendant had not won a place of temporary safety at the time he shot Gulsvig, as a result of which the robbery of Gulsvig had not been completed, and the shooting occurred 'in the course of commission of the robbery' of Gulsvig." (*Id.* at pp. 584–585.)

Carroll*, supra*, 1 Cal.3d 581, is thus inapposite. There was no question that Carroll used force or fear to take Gulsvig's wallet, and no question that there was a completed robbery with respect to the wallet. The issue was simply whether, for the purpose of applying the great bodily injury enhancement, this robbery could be deemed to have continued through the time Carroll shot Gulsvig behind the bar. To resolve this issue the court applied the escape rule. Here, Etheridge did not use force or fear to take the steak, and he abandoned the steak before he used any force. The issue is whether there was a robbery and, applying established law, we necessarily conclude there was not. The escape rule is thus inapplicable. As the court stated in *Hodges*, *supra*, 213 Cal.App.4th 531, "the escape rule, concerning the *duration* of the offense, is not in play because no robbery was *committed*, there being no evidence that the person intended to deprive the owner of the property at the time force was used." (*Id.* at p. 543, fn. 4.) In addition, the Supreme Court has cautioned against applying the escape rule outside of the contexts of felony-murder and "several other ancillary consequences of robbery," such as the enhancement in *Carroll*. (*Cooper*, *supra*, 53 Cal.3d at pp. 1166–1167.) The court specifically rejected application of the escape rule to determine liability as an aider and

10

abettor of a robbery and noted, "[C]ases applying the escape rule to certain ancillary consequences statutes do not compel the conclusion that commission of a robbery also continues through the escape for our purposes here. In each of these cases we have been careful not to imply that this rule should apply outside the legal contexts expressly addressed." (*Id.* at p. 1169.) In the present case, the Attorney General attempts to apply the escape rule not to an ancillary consequence of robbery, but to argue the very existence of a robbery. We reject that attempt.

The Attorney General also relies upon *People v. Pham* (1993) 15 Cal.App.4th 61, which is both distinguishable and supports Etheridge's contention. There, Pham was removing objects from a car belonging to Guevara. Guevara approached and Pham fled with a black bag. Guevara chased and caught Pham. Pham "dropped the bag where he stood and began slugging Guevara['s]" head. Guevara's friend, Oravec, came to assist and grabbed Pham. Pham kicked, punched, bit, and kneed both Guevara and Oravec, but they subdued him until the police arrived. Property belonging to Guevara and Oravec was found inside the black bag. (*Id.* at p. 64.) On appeal, Pham argued that the evidence was insufficient to support his robbery conviction because he dropped the bag and never regained possession or carried it away. (*Id.* at pp. 64–65.) The appellate court disagreed, stating, "Under the facts of this case, we conclude the asportation or carrying away of the property occurred when defendant removed the victims' property from Guevara's car and began to flee. The asportation continued while defendant struggled with the victims and prevented them from immediately recovering their goods. Contrary to defendant's contention, robbery does not require that the loot be carried away *after* the use of force or fear." (*Id.* at p. 65.) The court noted, "If defendant truly abandoned the victim's property before using force, then, of course he could be guilty of theft, but not of an *Estes*-type robbery." (*Id.* at p. 68.)

*Pham* is distinguishable from the present case. Whereas Pham dropped the bag where he stood and would have been able to pick it up and leave with it if he had succeeded in his efforts to overcome the victims' resistance, Etheridge "truly abandoned" the steak by throwing it on the roof before using force on Martinez. Had Etheridge

11

succeeded in subduing or deterring Martinez, he would not have been able to pick up the steak and leave with it.

Accordingly, we conclude that the court's instruction erroneously stated the law.

The Attorney General argues the error was harmless because the robbery verdict could have been based on the beer, the jury could have concluded that Etheridge "used force to temporarily retain possession of the stolen goods," or it could have concluded Etheridge did not intend to abandon the steak when he threw it on the roof because he retained the beer. As noted, the prosecutor effectively conceded there was a reasonable doubt regarding whether Etheridge stole the beer and elected to base the robbery solely upon the steak. In light of the prosecutor's concession and election and the evidence tending to show Etheridge bought the beer, we consider it highly improbable the jury would have found, beyond a reasonable doubt, that Etheridge stole the beer. No force was used until after Etheridge threw the steak on the roof; a conclusion by the jury that he used force to temporarily retain it would have been unsupported by any evidence. Finally, Etheridge's act of throwing the steak on a roof where he could not regain it without extraordinary effort was consistent with an intent to abandon it, while his retention of the beer was consistent with having purchased it. Retention of the beer in no way suggests Etheridge intended to come back with a ladder to recover the steak. We cannot conclude the error was harmless beyond a reasonable doubt.

We further conclude that, viewing the evidence in the light most favorable to the judgment, substantial evidence does not support Etheridge's robbery conviction. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.) He did not use force or fear to take possession of the steak or to resist attempts by the grocery store security personnel to retake the stolen steak. He abandoned the steak by throwing it on the roof before the guards caught up to him. He used force only *after* he abandoned the steak. Nor can the robbery conviction rest upon the beer. Martinez did not see whether Etheridge paid for the beer, as Etheridge claimed. The testimony of the store manager and the cashier supports Etheridge's claim he purchased it, as does Martinez's testimony that the beer was in a Lucky's bag and Etheridge's failure to treat the beer and steak in the same manner. And, as previously

12

noted, the prosecutor elected not to use the beer as a basis for the robbery conviction. Accordingly, we conclude the robbery conviction was not supported by sufficient evidence and may not be retried, as the Attorney General requests.

The parties agree that the robbery conviction may be reduced to petty theft with a prior, notwithstanding the jury's acquittal of that offense in count 2. Accordingly, we modify Etheridge's conviction and remand for resentencing.

## DISPOSITION

The petition for a writ of habeas corpus is granted. Etheridge's conviction of robbery is modified to be a conviction of petty theft with a prior, pursuant to Penal Code section 666. The matter is remanded for resentencing.

NOT TO BE PUBLISHED.


                                        MALLANO, P. J.

We concur:


        ROTHSCHILD, J.


        CHANEY, J.

13